379 P.3d 1011

**Shuja Sayed AHMAD and Margaret S. Ahmad, surviving parents of Alexander Sayed Ahmad, deceased, Plaintiffs/Appellants,**

v.

**STATE of Arizona, a body politic, Defendant/Appellee.**

**No. 1 CA-CV 14-0664**

Court of Appeals of Arizona,
Division 1.

FILED 7/12/2016

Treon & Aguirre, PLLC, Phoenix, By Richard T. Treon, Co-counsel for Plaintiffs/Appellants.

Treon & Shook, PLLC, Phoenix, By Daniel B. Treon, Co-counsel for Plaintiffs/Appellants.

Arizona Attorney General's Office, Tucson, By Robert R. McCright, Counsel for Defendant/Appellee.

Presiding Judge Peter B. Swann delivered the opinion of the court, in which Judge Lawrence F. Winthrop and Judge Donn Kessler joined.

## OPINION

SWANN, Judge:

¶1 Shuja Sayed Ahmad and Margaret S. Ahmad appeal from the trial court's order of remittitur or conditional new trial on damages only, which reduced a jury's damage award arising from the wrongful death of their son. A.R.S. § 12–613 provides that in wrongful death cases, "the jury shall give such damages as it deems fair and just." We hold that this broad provision requires utmost deference to the jury's sense of fairness, and remittitur in such cases must be based upon specific findings demonstrating that no reasonable jury could have reached the verdict based on the evidence presented. The court made no such findings here, and we reverse.

## FACTS AND PROCEDURAL HISTORY

¶2 On December 5, 2007, the Ahmads' son, Alex, was killed when the vehicle driven by a suspect pursued by law enforcement officers crossed the center line of a surface street and struck Alex's car.

¶3 The chase began after a bank robbery in Tempe. Law enforcement from Tempe, Mesa, Chandler and the Department of Public Safety pursued the suspect. Because the suspect was driving more than 100 mph on surface streets, Tempe police requested all units to slow down "so we don't have any accidents." A Mesa officer also asked dispatch to request that the other agencies turn off their lights and sirens, so they would not alert the suspect to their presence and cause him to flee. This message did not get relayed to DPS officers. When DPS Officer Phillips saw the suspect's car pass his location, he joined the pursuit on the highway, and then followed the suspect onto a surface street where the suspect accelerated to 113 mph. The suspect then crossed the center line and struck Alex's car, killing both of them.

¶4 The Ahmads sued the State of Arizona for wrongful death.[1] They presented evidence at trial that DPS was negligent because the pursuit was unnecessary and the dispatchers failed to communicate necessary information to DPS units. The state presented evidence that the suspect intentionally struck Alex's car to avoid capture.

¶5 The state objected several times that the Ahmads' counsel improperly asked the jury to "send a message" to the state, urging them to consider exemplary and punitive damages when only compensatory damages were permitted. It also moved the court to strike the Ahmads' counsel's opening statement, give an additional admonition to the jury about permitted damages, and instruct the Ahmads' counsel not to ask the jury to "send a message" during closing arguments. The court declined to instruct the Ahmads' counsel on what arguments he could make during closing but agreed to consider the state's objections on a statement-by-statement basis. The state did not object during the plaintiffs' closing.[2] The court properly instructed the jury on compensatory damages only, but declined to give any additional

---

1. The Ahmads had named the City of Chandler, Sheriff Joseph Arpaio, and other unnamed defendants in the original complaint. The City of Chandler and Sheriff Arpaio were dismissed by stipulation.

2. After the Ahmads' closing but before the state's closing, a spectator in the courtroom, unaffiliated with the parties, stood up and yelled "He's got a gun," tackled Officer Phillips, and tried to wrestle his gun away from him. Others present in the courtroom subdued the spectator, and the court recessed the case early that day. The court asked the jurors if "anybody believes that they are so impacted that they cannot be fair and impartial to each side and judge the case on its facts" after the disruption, but no jurors indicated they would have difficulty continuing. Neither party asked for a mistrial at the time. The Ahmads have since speculated that this incident affected the outcome of the trial, but we discern no prejudice on this record.

instructions on damages. And it denied the motion to strike the Ahmads' counsel's closing statement from the record.

¶ 6 The jury entered a verdict in favor of the plaintiffs, awarding them $30 million in damages, and finding the state 5% at fault in Alex's death. The state filed a motion for a new trial on damages or alternatively a remittitur, arguing that the damages were clearly excessive. The state again contended that the plaintiffs' counsel had led the jury improperly to consider punitive or exemplary damages and that the jury had improperly calculated damages based on the value of Alex's life instead of the harm done to his parents. The state also argued that because of the Ahmads' "strength and resilience" in handling their son's death, they presented "no evidence under which the jury could have properly found that Plaintiffs' compensable injuries were so exceptional that they justified a verdict of $30 million."

¶ 7 The Ahmads countered with a conditional motion for a new trial on all issues, arguing that if the court granted the remittitur and a new trial on damages, the issues of liability and damages were so intertwined that a trial on damages only would be unfair.[3] The court granted the remittitur, reducing the amount of damages to $10 million, thereby reducing the state's responsibility from $1.5 million to $500,000, and alternatively a conditional new trial on damages only. In support of its order, the court wrote:

> While courts generally [are] loathe [sic] to alter a jury award, Rule 59 of the Arizona Rules of Civil Procedure does permit a verdict, decision, or judgment to be vacated and a new trial granted if a damages award is excessive or insufficient. Based upon the evidence presented at trial and the damages recoverable in this action, the Court finds that the thirty million dollar award was excessive. Although the award by the jury was excessive, the Court acknowledges the findings of the jury. Based upon the evidence presented at trial, the Court finds that the reasonable value of damages is ten million dollars. Although this amount is on the high side of a reasonable and just damages amount, based upon the facts and law in this case and in deference to the jury's damages decision, the Court finds this amount appropriate.

¶ 8 The court denied the Ahmads' motion for reconsideration, and they appeal.

## DISCUSSION

¶ 9 "The law is well settled in Arizona that the amount of an award for damages is a question peculiarly within the province of the jury, and such award will not be overturned or tampered with unless the verdict was the result of passion and prejudice." *Larriva v. Widmer*, 101 Ariz. 1, 7, 415 P.2d 424, 431 (1966). But "verdict size alone does not signal passion or prejudice." *Hutcherson v. City of Phoenix*, 192 Ariz. 51, 57, ¶ 36, 961 P.2d 449, 455 (1998). We begin with the question "whether the verdict rendered, as compared with legal damages shown is so unreasonable and outrageous as to shock the conscience of this court." *Stallcup v. Rathbun*, 76 Ariz. 63, 66, 258 P.2d 821 (1953). If the court determines that the award was the result of passion or prejudice, the proper remedy is a new trial. *In re Estate of Hanscome*, 227 Ariz. 158, 162, ¶¶ 12–13, 254 P.3d 397, 401 (App. 2011). A remittitur is appropriate when the verdict reflects "an exaggerated measurement of damages," but not when it is "shocking[ly] or flagrantly outrageous." *See Stallcup*, 76 Ariz. at 65–67, 258 P.2d 821.[4] As a matter of law, the trial court is "not free to reweigh the evidence and set

---

**3.** Because we reverse the remittitur, we do not reach the issue of the scope of a new trial.

**4.** *Stallcup* embraced the standard in *Coleman v. Southwick*, 9 Johns. 45, 1812 WL 989 (N.Y. Sup. 1812), for determining whether a verdict is "flagrantly outrageous":

> The damages, therefore, must be so excessive as to strike mankind, at first blush, as being beyond all measure, unreasonable, and outrageous, and such as manifestly show the jury to

have been actuated by passion, partiality, prejudice, or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line, for they have no standard by which to ascertain the excess.

76 Ariz. at 66, 258 P.2d 821. No such finding exists in this case, nor would such a finding have been supportable.

aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because [the] judge[ ] feel[s] that other results are more reasonable." *Hutcherson*, 192 Ariz. at 56, ¶ 27, 961 P.2d at 454 (citation omitted).

■ ¶ 10 While we accord "[t]he greatest possible discretion" to the trial court's order of a remittitur "because ... it has had the opportunity to hear the evidence and observe the demeanor of witnesses," *Mammo v. State*, 138 Ariz. 528, 533–34, 675 P.2d 1347, 1352–53 (App. 1983), a remittitur is only proper "for the most cogent reasons," *Young Candy & Tobacco Co. v. Montoya*, 91 Ariz. 363, 370, 372 P.2d 703 (1962) (citation omitted), such as a "lack of evidence to support the damages awarded or a clear indication that the jury misapplied the principles governing damages," *Hanscome*, 227 Ariz. at 162, ¶ 14, 254 P.3d at 401. And "each case involving a request for remittitur must stand or fall on its own peculiar facts, and the ultimate test will always be justice." *Desert Palm Surgical Group, P.L.C. v. Petta*, 236 Ariz. 568, 582, ¶ 40, 343 P.3d 438, 452 (App. 2015). We discern no lack of evidence to support the damages awarded in this case.

■ ¶ 11 Wrongful death actions are creatures of statute. Under A.R.S. § 12–613, the jury "shall give such damages as it deems fair and just" for "the injury resulting from the death to the surviving parties." Those injuries may include "loss of love, affection, companionship, consortium, personal anguish and suffering." *Vasquez v. State*, 220 Ariz. 304, 310, ¶ 16, 206 P.3d 753, 759 (App. 2008) (citation omitted). The state's suggestion that the Ahmads must show economic damages or future expected support to justify the award's size is simply incorrect. Moreover, we find no basis in the statute for the state's contention that because the Ahmads' "only injuries were emotional," the damages awarded could not be "within the 'realm of reason.' "

¶ 12 The state also relies heavily on the notion that remittitur should be guided by a canvass of jury verdicts in "similar" cases. Citing Bennett Evan Cooper et al., *Arizona Practice, Trial Handbook for Arizona Lawyers* § 33:16 (2014), and a single seventy-five-year-old Arizona case as authority, it presents a range of verdicts to demonstrate that the award in this case (at least before reduction under comparative fault rules) was disproportionately large. We find this approach unpersuasive for several reasons.

¶ 13 First, the trial court's own order does not rely on a comparative analysis of wrongful death verdicts. And there is no assurance that the "similar" cases the state presented accurately represent the range of expected results in wrongful death disputes. The state's sample covers only the time from 2000 through February 2010, and does not include all wrongful death cases from those years.

¶ 14 Second, and more fundamentally, the crude statistical approach the state urges is simply at odds with A.R.S. § 12–613. The sole Arizona authority upon which the state relies is *Standard Oil Co. of California v. Shields*, 58 Ariz. 239, 119 P.2d 116 (1941). That case was not a wrongful death case—it concerned an automobile accident in which the plaintiff was merely injured without permanent impairment. *Id.* at 241, 247, 119 P.2d 116. The case also involved quantifiable special damages, and the supreme court upheld a modest remittitur. *See id.* at 247–48, 119 P.2d 116. Tellingly, the court did not impose a requirement that courts constrain jury verdicts to amounts consistent with other cases. Instead, it merely noted: "We have examined our own records, and so far as we have been able to ascertain, the largest judgment for individual personal injuries which has come before this court and was sustained, was $25,000." *Id.* at 248, 119 P.2d 116. *Shields* prescribed no rule limiting damages to verdicts in other cases, and the folly of such an interpretation of the case is evident from the quoted language—it would be difficult to argue that even inflationary increases of the $25,000 extreme in 1941 would represent adequate compensation in all personal injury cases today.

¶ 15 In *Wry v. Dial*, 18 Ariz.App. 503, 514–15, 503 P.2d 979 (1972), this court cautioned against over-reliance on verdict comparisons:

Making references to verdicts in other cases, from our own jurisdiction or others is a dangerous game, to say the least. No

two persons are alike. No two injuries are alike. No two juries are alike. We hope the day will never come when awards for pain and suffering in personal injury suits are based upon pre-determined schedules. The worth and dignity of the individual is a touchstone of our society.

¶ 16 We agree with *Wry* that each jury is required to give each litigant individual consideration based on the evidence in the individual case. Each jury is also entitled to great deference—especially when its statutory mission is to enter a verdict that is simply "just" and "fair."[5]

¶ 17 In finding the award excessive, the court wrote simply that its decision was "[b]ased upon the evidence presented at trial and the damages recoverable in this action." The court identified no deficiency in the evidence—indeed, it articulated no basis for its apparent decision that the verdict was not "just and fair" at all. Without explanation of its rationale, the court simply remitted the aggregate award to $10 million, opining that "[a]lthough this amount is on the high side of a reasonable and just damages amount, ... the Court finds this amount appropriate." Even under the deferential standard of review we accord remittitur, we cannot uphold the judicial discount of a jury verdict based solely on an unarticulated subjective concept of "reasonableness." In this case, the jury chose the amount it considered "fair and just," and the court was not free to disregard that determination without identifying some palpable defect in the evidence or verdict.[6]

¶ 18 This case, like most wrongful death cases, did not permit precise measurement of damages. The statutory measure of damages was not related to any demonstrated economic loss, and we read the legislature's commitment of damages to the jury's sense of justice as a broad appeal to the jury's conscience. We do not know what evidence the court evaluated to arrive at its conclusion that the jury award was "on the high side," nor how it arrived at the $10 million sum.

## CONCLUSION

¶ 19 Because the court found no concrete defect in the jury's award, we reverse its remittitur and remand for entry of judgment on the verdict.

5. A reliable survey of damages in similar cases can serve as a useful reference. In *Desert Palm Surgical Group*, we held the remittitur appropriate because the plaintiffs did not present any evidence to demonstrate their alleged economic or special losses. 236 Ariz. at 583–84, ¶¶ 41–45, 343 P.3d at 453–54. A review of civil jury verdicts revealed that the award of approximately $12 million dollars in a defamation and false light invasion of privacy case was among the largest of all awards that year in Arizona and nearly four times larger than the next largest defamation verdict. *Id.* at 576, 584, ¶¶ 12–13, 44,

343 P.3d at 446, 454. That survey merely illustrated that the verdict was excessive in light of the scant evidence of special damages; it did not accord past verdicts the power to establish a ceiling on damages in future cases. *Desert Palm Surgical Group* also did not arise under A.R.S. § 12–613.

6. The seriousness with which the jury took its task in this case is illustrated by the fact that it attributed only 5% of the fault to the state. Such is not the act of a "runaway" jury.