921 P.2d 933 (1996)
Beth MOTENKO; Allen Motenko; Beth Motenko, as Mother and Natural Guardian of Allen Motenko, a Minor, Appellants,
v.
MGM DIST., INC., f/k/a MGM Desert Inn, Inc., a Nevada Corporation d/b/a the Desert Inn Hotel & Casino, Respondent.
No. 25323.
Supreme Court of Nevada.
August 16, 1996.
*934 Galatz, Earl & Bulla, Las Vegas, for Appellants.
Pyatt & Eglet, Las Vegas, for Respondent.

OPINION
SHEARING, Justice:
Appellant Allen Motenko ("Allen") and his family ("the Motenkos"), residents of Massachusetts, were in Las Vegas when Beth Motenko, Allen's mother, allegedly slipped on a loose tile, fell and was injured on the premises of the Desert Inn, owned by respondent MGM Dist., Inc. ("MGM"). Allen filed a claim for loss of parental consortium. The district court dismissed the claim because Nevada does not recognize a claim for loss of parental consortium. See General Electric Co. v. Bush, 88 Nev. 360, 498 P.2d 366 (1972). Observing that the injury occurred in Nevada, the district court concluded that the law of Nevada should be applied under the vested rights or lex loci delicti approach to choice of law problems advocated by the Restatement (First) of Conflict of Laws section 377 (1934) ("the vested rights approach").
The Motenkos appeal, arguing that the district court should have applied Massachusetts law, because Massachusetts is the domicile of the Motenko family and recognizes a claim for loss of parental consortium. The Motenkos ask us to adopt the significant relationship approach of the Restatement (Second) of Conflict of Laws section 145(1) (1971) ("the significant relationship approach").
Nevada has historically followed the vested rights approach in choice of law matters involving torts. See Laxalt v. McClatchy, 116 F.R.D. 438, 447 (D.Nev. 1987). This approach requires application of the substantive law of the forum in which the injury occurred. See Restatement (First) of Conflict of Laws § 377 (1934). Thus, because Nevada does not recognize a claim for loss of parental consortium, the vested rights approach would justify the district court's decision to dismiss Allen's claim. See Heidt v. Heidt, 108 Nev. 1009, 1011, 842 P.2d 723, 725 (1992); General Electric, 88 Nev. at 363, 498 P.2d at 371.
For thirty years, however, this court has not directly addressed the issue of whether the vested rights approach is appropriate. See Lightenburger v. Gordon, 81 Nev. 553, 580, 407 P.2d 728, 736 (1965). Since then, a majority of courts have abandoned the wooden application of the vested rights approach in order to avoid unjustifiably harsh results. See O'Connor v. O'Connor, 201 Conn. 632, 519 A.2d 13, 15-21 (1986) (reasoning that the vested rights approach fails to acknowledge that many jurisdictions may have legitimate interests in applying their own laws in a given controversy); Gutierrez v. Collins, 583 S.W.2d 312, 316 (Tex.1979) (noting that less than half of the states continue to adhere to the vested rights approach). This trend does not, by itself, give us cause to reevaluate the vested rights approach. We must agree, however, that the approach can produce harsh results because the approach demands a blind application of the law of the place of the accident.
In contrast, the significant relationship approach, advocated by the Motenkos, provides that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties." Restatement (Second) of Conflict of Laws § 145(1) (1971). The Restatement sets forth the factors to be considered for this choice-of-law analysis as follows:
(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
(a) the place where the injury occurred,
(b) the place where the conduct causing the injury occurred,
(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

*935 (d) the place where the relationship, if any, between the parties is centered.
Id. In order to determine which jurisdiction's law should apply in a tort action, the substantial relationship test directs the court to select the law of the jurisdiction which has the most significant relationship to the issue after considering these factors. The substantial relationship test assigns no particular weight or priority to the contacts it lists or the Section 6 principles.[1]
This test suffers from two defectslack of uniformity and lack of predictability. Different judges can weigh the same factors to reach opposite conclusions. For example, the dissenting justices conclude that Massachusetts law should apply in the instant case after applying these factors. On the other hand, when we consider the very same factors, we conclude that Nevada law should apply. In the instant case, every factor except the plaintiff's residence favors the selection of Nevada law. Yet, the dissent would hold that the law of the plaintiff's residence trumps all other considerations. When judges who thoughtfully consider the issue under the same standard reach sharply divided results, it appears that it is impossible to predict the outcome under this approach without more direction. We believe that it is necessary to recognize a rule that is more certain in its outcome. Even Section 6 of the Restatement recognizes that certainty, predictability and uniformity of result are important factors in choosing the applicable law. Wholesale adoption of the substantial relationship test to actions sounding in tort would not promote these desirable aims.
We agree that the vested rights approach should be abandoned and therefore, we propose an approach that would harmonize Nevada's interest in stability in this area and the substantial relationship test. Under this approach, the law of the forum (the place where the action is brought) governs in a tort case, unless another state has an overwhelming interest. Another state has an overwhelming interest if two or more of the following factors are met:
(a) it is the place where the conduct giving rise to the injury occurred;
(b) it is the place where the injury is suffered;
(c) the parties have the same domicile, residence, nationality, place of incorporation, or place of business and it is different from the forum state;
(d) it is the place where the relationship, if any, between the parties is centered.
Thus, the law of the forum retains presumptive weight in a tort case, but the presumption can be overcome by a court's finding that two or more of the above-listed factors are satisfied. This approach meets the goal of a higher degree of certainty, predictability and uniformity of result. It also allows a court to more frequently apply the law with which it is most familiarits own law. Yet, this approach allows for some flexibility in order to avoid irrational and unjust results. See Foster v. Leggett, 484 S.W.2d 827, 829 (Ky.1972) ("When the Court has jurisdiction of the parties its primary responsibility is to follow its own substantive law. The basic law is the law of the forum which should not be displaced without valid reasons").
Applying this approach to the facts of the instant case, the plaintiffs brought the action in Nevada so there is a presumption that Nevada law governs. An evaluation of the above-listed factors indicates that the presumption is not overcome. The second factor is the only factor that supports the use of Massachusetts law because the Motenkos live in Massachusetts and the injury has been suffered in that state. None of the other *936 factors are met because the accident occurred in Nevada, Motenko and MGM are not residents of the same state and they do not have any relationship separate from the tort. Thus, we conclude that Nevada law should be applied to the instant action.
We hereby adopt the foregoing choice-of-law approach in determining the rights and liabilities of the parties with respect to an issue in tort. We affirm the district court's order of dismissal, however, because the district court's decision reached the correct result. Hotel Riviera, Inc. v. Torres, 97 Nev. 399, 403, 632 P.2d 1155, 1158 (1981) ("If a decision below is correct, it will not be disturbed on appeal even though the lower court relied upon the wrong reasons").
ROSE, J., concurs.
YOUNG, Justice, concurring in the result:
Judge Cardozo may have indeed been correct in opining that the power of the precedent is only "the path of the beaten track." Benjamin Nathan Cardozo, The Growth of the Law 62 (1927). In the case presently under review, however, I am compelled to agree with Justice Jackson that "the mere fact that a path is a beaten one is a persuasive reason for following it." Robert H. Jackson, Full Faith and CreditThe Lawyer's Clause of the Constitution, 45 Colum.L.Rev. 1, 26 (1945). I find no compelling reason to abandon the beaten path to adopt the significant relationship approach to resolve choice of law problems because I am not convinced that the approach is analytically superior.
The distinctions that the significant relationship approach demands judges to make are often murky, prompting an Oregon court to lament that applying the approach resembles "skeet shooting with a bow and arrow: a direct hit is likely to be a rarity, if not pure luck." Fisher v. Huck, 50 Or.App. 635, 624 P.2d 177, 178 (1981). One need look no further than to the majority opinion to find cause for the lamentations of the Oregon court. After all, the presence of the Motenkos in Nevada in 1990, followed by over forty million tourists in 1994, was not a mere fortuity. The Motenkos were business invitees of the MGM, which is a Nevada corporation. Thus, Nevada is the place where the injury, the conduct causing the injury, and actions to redress the injury occurred. The vested rights approach, even if it is, as one might infer from the majority opinion, a toothless old dog, retains a sense of smell keen enough to determine in these circumstances that Nevada law should be applied.
The majority is, however, distracted by different odors, leading it to what I believe is an intolerable result. Applying the significant relationships test, the majority concludes that the law of Massachusetts, the domicile of the Motenkos' marriage, should be applied to determine whether a loss of parental consortium is compensable. This, the majority reasons, is because Nevada has no interest in determining the intra-family rights of the Motenkos, even if the state has an interest in the underlying cause of action.
This reasoning will no doubt come as a surprise to the MGM, its employees, and the vast numbers of Nevada residents who are dependent upon the tourist industry. Considering that compensation for interruption of the intra-family rights of the Motenkos will ultimately be extracted from the pockets of Nevada citizens, I respectfully suggest that the distinction drawn by the majority is meaningless.
Nevada must protect its tourist industry as a matter of public policy. See NRS 463.0129(1)(a) (stating that "[t]he gaming industry is vitally important to the economy of the state and the general welfare of the inhabitants"). Indeed, because millions of non-residents regularly avail themselves of the exotic attractions of our state, it is safe to say that a relatively greater proportion of non-residents are slipping on loose tiles in Nevada than they are elsewhere. For this reason, I do not think it unreasonable to require non-resident tourists, while they are in Nevada, to be subject to Nevada laws.
Adoption of the significant relationship approach hinders promotion of this public policy. Furthermore, as the majority recognizes, our legislature has not seen fit to afford the citizens of this state the benefits of a cause of action for loss of parental consortium. Thus, Nevada citizens are themselves *937 barred from bringing such a claim in Nevada courts, and possibly in other courts applying the significant relationship approach. Because Massachusetts has modified the traditional vested rights approach, see Pevoski v. Pevoski, 371 Mass. 358, 358 N.E.2d 416, 417 (1976) (applying interest analysis), Nevadans visiting Massachusetts should exercise caution. Nevada children whose parents fall victim to bad clam chowder would conceivably be unable to recover for loss of consortium in that state. This is an unjust result which the vested rights approach, for all its faults, would not produce.
Our Nevada trial courts are also required to render justice in an inexpensive and speedy manner. See NRCP 1 (stating that the rules of civil procedure "shall be construed to secure the just, speedy, and inexpensive determination of every action"). The significant relationship approach does little to help meet this requirement. At the time the significant relationship approach was hatched, legal scholars recognized that an analysis of relevant interests "can be expected to cast an intolerable burden upon the overworked trial courts." Willis L.M. Reese, Chief Judge Fuld and Choice of Law, 71 Colum.L.Rev. 548, 559 (1971). This is because trial courts are required to analyze the relevant interests of each jurisdiction and party in order to make a proper choice of law. In weighing relevant interests, trial courts must distinguish between laws designed to influence conduct, allocate loss, and establish recovery after liability is established. Each type of law gives rise to different governmental and individual interests.
These various types of laws are all implicated, for instance, in an action to recover for damages incurred in an alcohol-related auto accident, an all-too-common tort. If a non-resident is struck in Nevada by a drunk driver, could the district court be forced to apply a foreign dram-shop act? See Lea Brilmayer, Interest Analysis and the Myth of Legislative Intent, 78 Mich.L.Rev. 392, 402-07 (1980). Should we apply a foreign dram-shop act if an intoxicated non-resident hits a Nevada resident? If the intoxicated non-resident is a minor, should we seek to apply possible common law recovery mechanisms found in his home state? What about punitive damages? comparative fault statutes? strict liability variations? See John B. Austin, A General Framework for Analyzing Choice-of-Law Problems in Air Crash Litigation, 58 J.Air L. & Com. 909, 926-79 (1993) (hereinafter "Austin").
The majority provides an example of the surprises that may be encountered in determining who is entitled to recover for damages. Should we apply Massachusetts law to determine whether to place caps on recovery? How should the recovery be calculated? Does Massachusetts hold a greater interest than Nevada in determining whether an award for loss of parental consortium should be reduced to present value? A district court should not be forced to answer these and many other similar questions, not only because of complexity and expense but because of uncertainty and the possibility of manipulation. These drawbacks led the Supreme Court of West Virginia to render the following candid admission:
[W]e remain convinced that the tradition rule [i.e., the vested rights approach], for all of its faults, remains superior to any of its modern competitors. Moreover, if we are going to manipulate conflicts doctrine in order to achieve substantive results, we might as well manipulate something we understand. Having mastered marble, we decline an apprenticeship in bronze.
Paul v. National Life, 177 W.Va. 427, 352 S.E.2d 550, 556 (1986).
Moreover, the problems encountered in choosing the proper law grow exponentially when many parties are involved. Complex tort litigation involving the significant relationship approach has been characterized by one commentator as "a lawyer's nightmare." Austin at 913. I suspect that the lasting trauma of this nightmare will be ultimately experienced by litigants and the district courts, not lawyers. Litigants are the ones paying to establish what interests are involved, through expert testimony and other means. This added expense and accompanying uncertainty affects every stage of an action, from the prayer for relief, through offers of settlement, to judgment, and favors the wealthy over the poor litigant.
*938 These problems outweigh any comfort we may feel in knowing that the underpinnings of our new-found approach are philosophically intimidating. Witness the reasoning of an early proponent of the significant relationship approach: "We emphasized that what we adopted was not a rule, but a method of analysis that permitted dissection of the jural bundle constituting a tort and its environment to determine what elements therein were relevant to a reasonable choice of law." Conklin v. Horner, 38 Wis.2d 468, 157 N.W.2d 579, 581 (1968). After considering the pros and cons, however, I am inclined to agree with the Supreme Court of West Virginia, which responded to Conklin as follows: "That sounds pretty intellectual, but we still prefer a rule. The lesson of history is that methods of analysis that permit dissection of the jural bundle constituting a tort and its environment produce protracted litigation and voluminous, inscrutable appellate opinions, while rules get cases settled quickly and cheaply." Paul, 352 S.E.2d at 554.
Presumably for these reasons, a clear consensus of jurisdictions does not appear to embrace fully the significant relationship approach. Instead, many jurisdictions have devised their own formulae for making a proper choice of law. See, e.g., Rice v. Nova Biomedical Corp., 38 F.3d 909, 915 (7th Cir. 1994) (noting in Illinois that the law of the place of the accident retains mild presumptive weight); Chrysler Corp. v. Skyline Indus. Services, Inc., 448 Mich. 113, 528 N.W.2d 698, 702 (1995) (refusing to adopt a significant relationship or any other test, and recognizing that each case should be analyzed individually); O'Connor v. O'Connor, 201 Conn. 632, 519 A.2d 13, 19 (1986) (following the vesting rights approach unless it would produce an improper result). For the foregoing reasons, I respectfully submit that the vested rights approach continues to be the best formula for Nevada.
Evidently feeling as I do, a large number of states remain unintimidated by the obscure dicta of Allstate Ins. Co. v. Hague, 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). See, e.g., Jackson v. Domtar Industries, Inc., 35 F.3d 89, 92 (2nd Cir.1994) (recognizing that Vermont still follows the vested rights approach); Stokes v. Southeast Hotel Properties, Ltd., 877 F.Supp. 986, 995 (W.D.N.C.1994) (recognizing continued use of the lex loci delicti principle in North Carolina); Clark v. Associates Commercial Corp., 870 F.Supp. 1011, 1014 n. 3 (D.Kan. 1994) (noting that Kansas continues to follow the vested rights doctrine); Mullins v. M.G.D. Graphics Systems Group, 867 F.Supp. 1578, 1580 (N.D.Ga.1994) (noting that Georgia follows the vested rights doctrine); Rhee v. Combined Enterprises, Inc., 536 A.2d 1197, 1198 (Md.Ct.Spec.App.1988) (affirming use of the vested rights approach in Maryland). Far from doing away with the vested rights approach, Allstate in fact recognized its continued use. See Allstate, 449 U.S. at 316 n. 22, 101 S.Ct. at 642 n. 22.
I respectfully submit that the focus of this court's concern should be upon the needs of this state, not upon whether this court is deemed to be progressive in the eyes of judicial colleagues outside our borders. I would, therefore, affirm the district court's order.
STEFFEN, Chief Justice, with whom SPRINGER, Justice, agrees, dissenting:
The majority concludes that Nevada should abandon the "vested rights" approach to determining choice of law in the area of torts, and then proceeds to adopt a hybrid rule that amounts to little more than the vested rights doctrine with a twist of lime.
I am of the opinion that the overwhelming trend among sister jurisdictions in favor of the "most significant relationship" doctrine is reflective of judicial sensitivity to the role of courts in promoting just and fair decisions in the area of tort law. I therefore write separately in dissent.
In theory, I need not criticize the old lex loci delicti (vested rights) rule, for the majority claims that it is abandoning the rule in Nevada. In its place, the majority has adopted a mathematical exercise that strongly defers to the vested rights rule absent a showing of an "overwhelming interest" in another state. Because the majority has essentially left the vitality of the vested rights doctrine intact, comment concerning the doctrine is warranted.
*939 The United States Supreme Court fired a direct volley against the lex loci delicti doctrine with compelling force:
While the place of the accident is a factor to be considered in choice-of-law analysis, to apply blindly the traditional, but now largely abandoned [vested rights approach], would fail to distinguish between the relative importance of various legal issues involved in a lawsuit as well as the relationship of other jurisdictions to the parties and the occurrence or transaction.
Allstate Ins. Co. v. Hague, 449 U.S. 302, 316 n. 22, 101 S.Ct. 633, 642 n. 22, 66 L.Ed.2d 521 (1981). Based upon the quoted material alone, the quality of the compaction of the constitutional soils upon which the vested rights doctrine rests must be questioned, and the reason is obvious. Individual justice will frequently be disserved in a jurisdiction where judicial blinders prevent a court from considering the various factors that should be weighed in determining conflicts of laws issues.
In Clark v. Clark, 107 N.H. 351, 222 A.2d 205, 207 (1966), a fitting epitaph to the moribund lex loci doctrine was written:
That old rule [lex loci delicti] is today almost completely discredited as an unvarying guide to choice of law decisions in all tort cases.... No conflict of laws authority in America today agrees that the old rule should be retained. See e.g. texts and articles by Cavers, Ehrenzweig, Hancock, Leflar, Morris, Reese, Rheinstein, Trautman, Traynor, von Mehren and Weintraub, to mention only a few. No American court which has felt free to re-examine the matter thoroughly in the last decade has chosen to retain the old rule. It is true that some courts, even in recent decisions, have retained it. But their failure to reject it has resulted from an unwillingness to abandon established precedent before they were sure that a better rule was available, not to any belief that the old rule was a good one. The only virtue of the old rule, apart from the fact of its pre-existence, was that it was easy for a court to apply. It was easy to apply because it was a mechanical rule. It bore no relationship to any relevant consideration for choosing one law as against another in a torts-conflicts case.
(Citations omitted.)
The majority's solution to the vested rights doctrine is a hybrid that retains allegiance to the old doctrine unless a party can demonstrate an "overwhelming" interest in the application of another state's law. In the process of leaching ambiguity from the term "overwhelming," the majority lists four factors similar to those used in the Restatement (Second) of Conflict of Laws, § 145, and then quantitatively concludes that an "overwhelming interest" exists if two or more of the factors are satisfied.
Unfortunately, the process of counting factors ignores qualitative contacts that should have a place of preeminence in choice-of-law analyses. The most significant relationship doctrine is designed to achieve a fair and just resolution to choice-of-law disputes by weighing the quality, not the quantity, of each state's interest in a disputed issue. Thus, in evaluating the contacts involved in an analysis of significant relationships, the focus is on the quality of contacts rather than their quantity. Schwartz v. Schwartz, 103 Ariz. 562, 447 P.2d 254, 257 (1968). Appropriately, the Restatement assigns no particular weight to any of the factors involved in the analysis. Indeed, one particularly strong interest can overcome three weaker interests. "The court's analysis ... does not turn on the number of contacts the event had with each jurisdiction, but, more importantly, on the qualitative nature of those contacts...." Crim v. International Harvester Co., 646 F.2d 161, 163 (5th Cir.1981); see also Moore v. Montes, 22 Ariz.App. 562, 529 P.2d 716 (1975) (indicating that "clearly ... it is a qualitative, not quantitative, analysis of the contacts which is crucial to the resolution of the choice-of-law question").
A qualitative evaluation under the most significant relationship doctrine promotes consideration of differing state policies and interests underlying the particular issue as factors for making the choice-of-law decision. Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796 (1964). Finally, the law of the state whose quality of contacts are the most significant will be applicable in resolving the *940 disputed issue. Johnson v. Spider Staging Corp., 87 Wash.2d 577, 555 P.2d 997 (1976); see also Schwartz, 447 P.2d at 257.
Turning now to the majority's solution for Nevada, we are informed that the law of the forum (lex loci) will apply in tort cases unless "another state has an overwhelming interest" in an issue. A state other than the forum state will have an overwhelming interest in a disputed issue if a party can demonstrate that the other state satisfies two or more of the following four factors:
(a) it is the place where the conduct giving rise to the injury occurred;
(b) it is the place where the injury is suffered;
(c) the parties have the same domicile, residence, nationality, place of incorporation, or place of business and it is different from the forum state;
(d) it is the place where the relationship, if any, between the parties is centered.
The majority claims to have created a formula that will retain predictability, certainty and uniformity of result in most cases, but will allow sufficient flexibility to avoid unjust and irrational results in those few cases demanding deference to the law of another state. In disagreeing, I first note that the majority has changed the wording of the Restatement in three of the four factors quoted above sufficiently to create ambiguity and uncertainty. I will comment on the variations used by the majority because we are given no purpose or reasons for their adoption, and aside from the ambiguities they create, their use will retard opportunities for the promotion of uniformity in the meaning of terms and the law which they support, both locally and on a national level.
Factor (a) in the majority's formula roughly corresponds with factor (b) in the Restatement which reads "the place where the conduct causing the injury occurred." (Emphasis added.) By substituting the phrase "giving rise to" for the word "causing," the majority creates an ambiguity arising out of an equivocation not normally used to describe causation, which is an element of a cause of action sounding in tort. Several factors somewhat remote from the causative event could "give rise to" or "contribute to" an injury, and I fail to see the rationale for introducing terminology that is conducive to uncertainty.
Factor (b), above, appears in the Restatement under subsection (a) as "the place where the injury occurred." (Emphasis added.) The majority, in changing the word "occurred" to the word "suffered," has arguably altered the basic meaning of the factor. An injury can occur in the forum state, but be primarily suffered in the injured party's place of domicile. Indeed, based upon the finding by the majority that the injury was suffered by the Motenkos in Massachusetts because they reside there, the majority seemingly interprets their own language to refer to the state where the impact of the injury is most strongly or enduringly felt. Such an interpretation would be highly relevant in a qualitative evaluation of the impact on another state of an injury occurring in the forum state. Since the majority's formula leaves no room for qualitative analysis, however, it would appear that this factor is simply viewed by the majority, at least in the present case, as a synonym for place of residence. Thus, if a party injured in Nevada will do most of his or her suffering in another state, that factor will be satisfied. Here, although both the mother who sustained personal injury, and her son, Allen, who suffered the "injury" occurring through loss of parental consortium, were in Las Vegas at the time of the occurrence upon which liability is based, their home was in Massachusetts, where they would continue to feel the loss of parental consortium. Although I do believe that the Restatement language referring to the place where the injury occurred could be viewed, at least under the circumstances of the instant case, as being synonymous with the majority's use of the term "suffered," I see little reason to introduce a term that will not benefit from developing and refining decisional law throughout the nation.
The majority's factor (c) is vastly more restrictive than the corresponding language under factor (c) of the Restatement, which states "the domicile, residence, nationality, place of incorporation and place of business of the parties" shall be a contact taken into *941 account in determining the law applicable to an issue. The majority would require the litigants to have commonality of domicile, etc., and the place commonly shared would have to be outside the forum state, that is, outside the State of Nevada. Again, the majority provides no explanation for the substantial change wrought by their choice of language, and I see none other than to assure continued vitality in the lex loci delicti doctrine.
Factor (d) as adopted by the majority is identical to the same factor written in the Restatement.
In analyzing the four factors adopted by the majority, the majority concludes that only factor (b) (the place where the injury is suffered) "counts" toward the application of Massachusetts law, therefore Massachusetts is one factor short of having its local law apply in resolving the issue of loss of parental consortium. Unfortunately, the majority has "stacked the deck" to the point where the place of the tort will continue to determine the choice of law in the overwhelming majority of the cases.
Assuming, with some uncertainty, that factor (a) will be construed by the majority to mean the place where the conduct causing the injury occurred, then invariably, the only occasion when the local law of another state might apply in the resolution of a disputed issue would be where all parties share the same domicile, residence, nationality, etc., and the shared place is outside of Nevada. Indeed, if the instant case had not presented an issue of parental consortium, factor (b), the place where the injury is suffered, may have been construed to mean the place where the injury occurred, i.e., Nevada. Moreover, in cases where personal injury and the extent thereof is suffered (occurred?) in Nevada, and forms the only basis for liability, even the commonality of the place of domicile, etc., outside of Nevada would not provide a sufficient basis for applying the local law of another state (depending, of course, on the interpretation given to the word "suffered"). In short, the "flexibility" written into the new mathematical rule by the majority is far more illusory than real, and provides little consideration to the policies and interests implicated in the just resolution of issues that require choice-of-law decisions.
If the majority had adopted the position taken by the Restatement, the following analysis would apply:

The place where the injury occurred
This factor could arguably favor applying the law of either Nevada or Massachusetts in resolving the Motenkos' claim for loss of parental consortium. Nevada could be considered the place of injury because Beth Motenko was injured in Las Vegas and a claim for loss of consortium is derivative of that injury. The local law of Massachusetts could also qualify under this factor because that is the place of the Motenkos' domicile and where the son, Allen Motenko, will primarily suffer the loss of his mother's consortium.
Loss of parental consortium is a relatively new cause of action and much of the analysis concerning the place of injury regarding this claim would parallel that of its analogue, loss of spousal consortium. "A minor child has a strong interest in his parent's society, an interest closely analogous to that of the spouse in a normal loss of consortium claim." Ferriter v. Daniel O'Connell's Sons, Inc., 381 Mass. 507, 413 N.E.2d 690, 692 (1980).
An argument favoring the application of Nevada law is that the law of the place of the injury to the spouse (parent) applies because that is where the last event necessary to create liability occurred. Sestito v. Knop, 297 F.2d 33 (7th Cir.1961); Jordan v. States Marine Corp., 257 F.2d 232 (9th Cir.1958). An action for loss of consortium can also be viewed as derivative of the primary harm to the physically injured spouse (parent). Miller v. Holiday Inns, Inc., 436 F.Supp. 460 (E.D.Va.1977) (concluding that because of the derivative nature of loss of consortium claims, the location of the marital domicile is irrelevant and the claim must be decided under the same law as the main claim). These authorities support the proposition that in an action for loss of consortium, the law of the place of the primary physical injury to the parent would apply because the *942 action is derivative of the parent's action for personal injury.
The argument favoring the application of Massachusetts' law notes that although the conduct causing the injury occurred in Nevada, the injury will be suffered primarily where the relationship between Allen Motenko and his injured mother is domiciled. Equally applicable to loss of parental consortium is the ruling in Avis Rent-A-Car Systems v. Abrahantes, 559 So.2d 1262, 1264 (Fla.App.1990), that
"[c]laims for loss of consortium are governed by the law of the state where the marriage is domiciled, rather than by the law of the state where the [physical] injury occurred .... The state in which the marriage is domiciled has a greater interest... in a loss of consortium case, than does the state where the incident occurred."
See also Linnell v. Sloan, 636 F.2d 65 (4th Cir.1980) (concluding that, although the physical injury was suffered in Iowa, Minnesota has the most significant relationship with the issue of an action for loss of consortium); Wright v. Minter, 736 F.Supp. 1024, 1028 (W.D.Mo.1990) ("the majority view, and the more recent trend, is that the law of the family domicile governs a conflicts question in an action for loss of either spousal or parental consortium"); Berghammer v. Smith, 185 N.W.2d 226 (Iowa 1971) (within the District of Columbia's choice-of-law rules, the law of the state of the marital domicile rather than the law of the state where the wrong occurred should control a loss of consortium action).
I am of the opinion that under the most significant relations test, this factor concerning the place where the injury occurred should be dispositive in applying the local law of the state of Massachusetts to the resolution of this issue. Unfortunately, since the majority looks only to quantity of contacts rather than quality, this most significant of all contacts falls by the wayside.

The place where the conduct causing the injury occurred
This factor favors the application of Nevada law. The conduct that resulted in the loss of parental consortium occurred in Las Vegas. In my view, however, this factor does not approach the significance of the place where the injury to the parent-child relationship occurred.

The domicile, residence, nationality, place of incorporation and place of business of the parties
This factor should be of no consequence because it applies to both Nevada and Massachusetts. The Desert Inn is a subsidiary of MGM, Inc. and is incorporated and domiciled in Nevada, whereas the Motenko family is domiciled in Massachusetts. Note, however, that because of the change in the language of the Restatement wrought by the majority, this factor would be counted against the Motenkos in the wooden application of the majority's mathematical formula.

The place where the relationship, if any, between the parties is centered
Because there is no relationship between Allen Motenko and the Desert Inn, neither has a superior interest and this factor becomes a non-factor. Again, however, because of the majority's wooden formula, this factor actually weighs against Allen Motenko. Under a qualitative analysis embraced by the majority of courts that have felt unencumbered by the legally unsound lex loci delicti doctrine, the local law of Massachusetts clearly has the most significant relationship to the Motenko's claim for loss of parental consortium. Unfortunately, the majority has given lip service to abandoning the old vested rights doctrine, but in reality has embraced it anew under the strictures of the mathematical formula the majority has crafted from the rule of reason and fairness adopted by the Restatement.
I am strongly of the opinion that this court should adopt the Restatement (Second) Conflicts of Laws most significant relationship approach as the most equitable method for resolving choice-of-law problems in tort cases. In my view, the majority has created a wooden hybrid rule that essentially retains the evils of the vested rights doctrine, and provides precious little promise for the resolution of conflicts issues in accordance with judicial sensitivity to considerations of justice *943 and fairness. It is true that the majority's rule will provide ease of application, but I suggest that courts of law should have no part in exalting easily applied rules over less facile methods that are calculated to secure a just and fair result in the resolution of disputes. Ease of application alone should never be the basis for adopting rules to be used in determining the rights of litigants.
For the reasons discussed above, I would reverse the order entered by the district court and allow the Motenkos to pursue Allen's claim for loss of parental consortium based upon the local law of Massachusetts. I therefore respectfully dissent.
NOTES
[1] Section 6(2) of the Restatement (Second) which sets forth the general principles in choice-of-law decisions states:

[T]he factors relevant to the choice of the applicable rule of law include:
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.